651 So.2d 1359 (1995)
STATE of Louisiana, DEPARTMENT OF TRANSPORTATION & DEVELOPMENT
v.
SCHWEGMANN WESTSIDE EXPRESSWAY, INC.
No. 94-CA-0472.
Court of Appeal of Louisiana, Fourth Circuit.
January 31, 1995.
Rehearing Denied April 19, 1995.
*1361 Jesse S. Guillot, New Orleans, Salvatore Panzeca, Metairie, and Robert L. Ledoux, Frederick J. Fuselier, Baton Rouge, for plaintiff.
David Stone, Randall A. Smith, Stephanie D. Shuler, Stone, Pigman, Walther, Wittmann & Hutchinson, New Orleans, for defendant.
Before KLEES, ARMSTRONG and LANDRIEU, JJ.
ARMSTRONG, Judge.
This is an appeal by the State of Louisiana, Department of Transportation and Development ("DOTD") from a money judgment following a jury trial in an expropriation case. The landowner whose property was expropriated is Schwegmann Westside Expressway, Inc. ("Schwegmann"). DOTD raises four issues on appeal: (1) whether the jury found excessive severance damages; (2) whether the severance damages awarded exceeded those claimed in Schwegmann's answer, (3) whether the trial court erred by excluding from evidence the written reports of appraisers; and (4) whether the trial court awarded excessive expert fees and other costs. We find no reversible error and affirm.
Schwegmann's property consists of two parcels in the Eastern New Orleans area. The northern parcel fronted directly on Chef Menteur Highway and extends south to Old Gentilly Road. The southern parcel extends from Old Gentilly Road south to Interstate 10. In other words, Schwegmann's property would be one contiguous parcel, extending northsouth from Chef Menteur Highway to Interstate 10, but for Old Gentilly Road running across it in an east-west direction. All of the property is leased to Schwegmann Giant Supermarkets. The northern parcel is used for parking. The southern parcel has a 255,000 square foot building which is used as a supermarket and corporate headquarters. DOTD expropriated the portion of the northern parcel which fronts directly on Chef Menteur Highway. Thus, Schwegmann's property no longer fronts directly onto Chef Menteur Highway. A rough sketch of the property, taken from DOTD's brief, is attached hereto as Appendix A.
The expropriation was done in connection with the construction of the elevated Danziger Bridge on Chef Menteur Highway. In addition to the taking of all the Schwegmann property's highway frontage, an elevated expressway was built directly in front (north) of the property where it used to front on Chef Menteur Highway. At trial, Schwegmann presented extensive expert testimony and other evidence that the property not taken suffered extensive severance damage as a result of the taking of all the highway frontage and the bridge project.
This severance damage occurred because of a loss of visibility, loss of access and loss of ease of ingress and egress. Before the expropriation, Schwegmann's property fronted directly onto a major six-lane highway (Chef Menteur) carrying some 30,000 cars a day, with easy direct visibility and access to the property in each direction. After the expropriation, Schwegmann's property fronted on a one-way service road carrying about 1,200 cars per day. Also, the service road must be entered from a lane that begins 500 feet west of the property, at a point from which the Schwegmann supermarket is not visible. *1362 There was evidence that the Schwegmann supermarket lost more than half its business soon after the bridge was constructed. (This evidence was admitted with the cautionary instruction that Schwegmann was not seeking and not entitled to compensation for loss of sales or profits, but that the supermarket's decline in business could be considered as evidence of loss of value of the property.)
The jury rendered a verdict of $150,000 damages for the property actually taken and $4,850,000 severance damages to the remaining property. The first item of damages, the $150,000 damages for the property actually taken, is not at issue on appeal. However, DOTD argues that the $4,850,000 severance damages is excessive.
The measure of severance damages is determined by La.R.S. 48:453(B) which states:
The measure of damages, if any, to the defendant's remaining property is determined on a basis of immediately before and immediately after the taking, taking into consideration the effects of the completion of the project in the manner proposed as planned.
Thus, the jury's task was to determine the amount by which the value of the non-expropriated property was reduced by the taking of the entire highway frontage and the construction of the elevated expressway.
In an expropriation case, the jury's determination of the amount of damages is a factual one and may not be overturned on appeal absent manifest error. West Jefferson Levee District v. Coast Quality Construction, 640 So.2d 1258, 1277-78 (La.1994). See also Stobart v. State, Through Dept. of Transportation and Development, 617 So.2d 880, 882-83 (La.1993) (discussing manifest error standard of review).
DOTD's argument is based on the fact that none of the five appraisers who testified, three for DOTD and two for Schwegmann, estimated the severance damages to be nearly as high as the jury's determination of severance damages. Thus, DOTD argues, the jury's determination must be wrong. However, the appraisers did not limit their testimony to estimations of severance damages but, instead, testified as to the value of the property before and after the expropriation. They also testified as to how they arrived at those before and after expropriation values. Further, four non-appraiser expert witnesses, who were qualified to testify as to the impact of the expropriation on the value of the property, also testified for Schwegmann. Lastly, there was direct factual (non-opinion) evidence of the adverse impact of the expropriation on the business of the supermarket located on the property which, in turn, evidences an adverse impact on the value of the property.
Five appraisers testified. For DOTD, McCormick testified to a before value of $8,984,000 and an after value of $8,881,530; Eppling testified to a before value of $8,177,328 and an after value of $7,883,556; Talluto testified to a before value of $8,148,786 and an after value of $7,871,036. For Schwegmann, Felts testified to a before value of $3,660,000 and an after value of $2,765,000 and Guice testified to a before value of $4,050,000 and an after value of $3,200,000.
Two key facts emerge from the five appraisers' testimony as to how they arrived at the before and after values. First, the three DOTD appraisers appraised the property as a "special purpose" property and, specifically, as a Schwegmann's supermarket. The two Schwegmann appraisers did not appraise the property as a "special purpose" property. Thus, the DOTD appraisers found the property to have much higher value than did the Schwegmann appraisers. The two Schwegmann appraisers testified that, if they had appraised the property as a "special purpose" property, then the before expropriation values they found would have been much higher. In fact, Guice testified that an appraisal done on a "special purpose" property basis would have resulted in a before expropriation value in the range of $10,000,000 to $12,000,000. Thus, the jury reasonably could have determined the before expropriation value of the property to be as high as $8,984,000, which was McCormick's before expropriation value.
The second key fact to emerge from the five appraisers' testimony as to how they performed their appraisals is that the three DOTD appraisers assumed that, after the *1363 expropriation, the highest and best use of the property remained as a "special purpose" property and, specifically, as a Schwegmann's supermarket. So far as the DOTD appraisers were concerned, the expropriation merely took some of the parking lot and did not affect the supermarket. However, the two Schwegmann appraisers both testified that, after the expropriation, the highest and best use of the property was for a warehouse or a discount retail flea market type of operation. Thus, the jury reasonably could have determined the after expropriation value of the property to be as low as $2,765,000 which was Felts' after expropriation value.
If the jury determined the before expropriation value of the property to be $8,984,000 and the after expropriation value to be $2,765,000 then the total damages reasonably could be determined to be as much as $6,219.000. Therefore, the jury's determination of severance damages of $4,850,000 is well within that reasonable amount.
Schwegmann supported its argument that the expropriation had altered the highest and best use of the property, and severely damaged its value, with the testimony of four other expert witnesses. The first, John Schwegmann, was qualified as an expert in supermarket and shopping center development and operation. He testified that, based upon his experience and regular surveys of the grocery business, more and more shopping is done on "impulse" with convenience of and access to a supermarket being the key to its success. Thus, the loss of convenience of and access to the Schwegmann property as a result of the expropriation made it much less suitable for a supermarket site and much less valuable.
The second Schwegmann non-appraiser expert witness, Don Schwartz, was qualified as an expert in sales and leasing of retail real estate in the Eastern New Orleans area. He testified that the value of retail property is determined by location, visibility and accessibility. He also testified that the expropriation substantially diminished the value of the Schwegmann property by greatly diminishing its visibility and access. As a result, he testified, shoppers will seek out more convenient stores and, thus, the value of the property is reduced.
The third Schwegmann non-appraiser expert witness, Roger Ogden, was qualified as an expert in real estate and shopping center development. He testified that the expropriation had "walled off" the front of the property and had "ninety percent cut off" Chef Menteur Highway from the property. He also testified that the lack of convenience of the property, as a result of the expropriation, would keep any retailer from going into such a location and would make it impossible to obtain financing to do so.
Schwegmann's fourth non-appraiser expert witness, Darryl Berger, was qualified as an expert in real estate development. He testified that the key factors for a successful site for shopping are visibility, proximity to a major road and convenient access with access being the most important factor. He also testified that the expropriation had cut off access to the Schwegmann property to such an extent that it was rendered "non-viable" as a retail site.
Lastly, Schwegmann presented evidence of the expropriation's actual impact on the supermarket. The supermarket had annual gross sales of over $60,000,000 just prior to the beginning of construction of the Danziger Bridge. As soon as construction of the bridge began, and continuing after its completion, the gross sales of the supermarket dropped by several millions of dollars a year until they were only about $35,000,000 six years after the beginning of construction. With some adjustment for inflation, it is apparent that the supermarket lost most of its business within six years of the beginning of construction. Of course, Schwegmann seeks and is entitled to compensation for only the loss of value of its property and not for the loss of sales or profits. However, the precipitous decline in gross sales is evidence that the Schwegmann property was rendered much less suitable for a retail site and, thus, became much less valuable.
DOTD argues on appeal that the jury could not accept a before expropriation value by one expert witness appraiser and an after expropriation value by a different expert witness appraiser. However, the jury in an *1364 expropriation case may accept a part of an expert witness appraiser's opinion and reject another part. Also, the jury may accept parts of two or more appraiser expert witnesses' testimony and reject other parts of their testimony. As we stated in State, Dept. of Hwys. v. New Orleans Terminal Co., 319 So.2d 568 (La.App. 4th Cir.1975):
We first address ourselves to the value of the property expropriated. The trier of fact in an expropriation proceeding is not required to accept in toto the testimony of any one witness or any one group of witnesses; he may accept and give greater weight to those portions of the testimony of each witness which in his opinion are more reasonable and logical, such being a necessary correlative of a trial judge's right to evaluate the testimony. In essence, the determination as to the value of expropriated property is a factual one and should not be disturbed on appeal unless the reviewing court is convinced such findings are clearly erroneous.
319 So.2d at 572-73. Similarly, the Third Circuit, following our New Orleans Terminal Co. case, has stated:
DOTD argues that the trial court's total award exceeds the amount of both appraisers, therefore, this was reversible error. We disagree. The trial court selected from both appraisal reports in arriving at the various values. The severance damages increased the award substantially. It was within the sound discretion of the trial court to give more weight to Mr. McCampbell's opinion on severance damages than Mr. Willet's opinion. It was not error for the trial court to accept one expert's opinion to the total exclusion of another. The trier of fact may accept and give greater weight to those portions of testimony of each witness which in its opinion are more reasonable and logical. State, Through Department of Highways v. New Orleans Terminal Co., supra. Therefore, in arriving at the amount of damages to be awarded it is clear that the trial court could select from each appraisal report.
State, Dept. of Transportation v. Rushing, 514 So.2d 209, 212 (La.App. 3rd Cir.1987).
Recently, the Supreme Court has stated that, in an expropriation case, the opinions of experts regarding valuation are "advisory" and are to be used to "assist" the trier of fact in determining the amount of compensation with the trier of fact determining the weight to be given to the expert's testimony. The trier of fact may weigh varying expert testimony and reach a value "that does not coincide with the testimony of any expert witness" when there is evidence in the record to reasonably support the finder of fact's valuation. West Jefferson Levee District v. Coast Quality Construction, 640 So.2d 1258, 1277 (La.1994).
DOTD cites a number of cases in support of its argument that the jury must pick one appraiser's valuations to determine severance damages. However, upon examination, it is apparent that those cases support only the proposition that a jury determination of damages which is supported by no evidence cannot stand. Of course, in the present case, as we have discussed above, the jury's determination of damages is supported by the evidence.
DOTD also attacks the testimony of John Schwegmann as unqualified and its brief dismisses the testimony of the other three non-appraiser expert witnesses. However, all four were qualified as experts in various aspects of real estate development and management which are relevant to the issues of whether the value of the Schwegmann property was damaged by the expropriation, how it was damaged and the general extent of such damage.
All four agreed that, after the expropriation, the highest and best use of the Schwegmann property was as a warehouse or discount retail flea market type of operation. All four were qualified to give that testimony and the jury could properly consider it. See State, Dept. of Hwys. v. Calvert, 209 So.2d 759, 761 (La.App. 2d Cir.1968) (non-appraiser real estate experts properly could give testimony on value or use of land).
Of the four, only John Schwegmann gave specific before and after expropriation values of the Schwegmann property. DOTD attacks this testimony as unqualified because *1365 John Schwegmann is not an appraiser. It may be that a landowner may testify as to the value of his or her property and severance damages subject to the general requirement that the testimony be supported by adequate proof. See State, Dept. of Hwys. v. Ensearch, 559 So.2d 787 (La.App. 1st Cir.), writ denied, 567 So.2d 85 (1990); State, Dept. of Hwys v. Allen, 422 So.2d 1368 (La.App. 1st Cir.1982). However, we need not decide that issue as the jury's damage determination is amply supported by the testimony of the appraiser expert witness.
In sum, we do not find that the jury committed manifest error in determining the severance damages to be $4,850,000 and the total damages to be $5,000,000. There is ample evidence in the record to support the jury's determinations.
As to second issue on appeal, DOTD very briefly argues that it should not be subjected to a $5,000,000 judgment because Schwegmann sought only $1,050,000 in damages in its answer to the expropriation petition. In the first place, we note that Schwegmann's answer seeks damages of "not less than $1,050,000." Thus, Schwegmann pleaded $1,050,000 as a minimum, not a maximum, of the damages sought.
The defendant in an expropriation suit must plead the amount it claims and itemize its damages with reasonable particularity. La.R.S. 48:450. In the present case, Schwegmann listed the various types of damages it sought at trial and which were awarded by the jury. Thus, there is no question that the damages sought were itemized with reasonable particularity. With that requirement fulfilled, we believe the allegation of "not less" than $1,050,000 is sufficient to sustain the judgment in this case. See Dept. of Transportation and Development v. Willard E. Robertson Corp., 563 So.2d 1165 (La. App. 4th Cir.1990) (expropriation defendant's answer sought $453,303.00 and $877,754.57 was awarded).
An expropriation suit is somewhat unusual, from the standpoint of pleading, because it is the defendant who may be entitled to damages. The effect of La.R.S. 48:450 is to ensure that the defendant's answer can function like a reconventional demand and that it alleges damages if any will be sought. The answer here was sufficiently pleaded so as to fulfill that function and to inform DOTD that very substantial damages, of particular types, were being sought.
DOTD does not assert that there was any unfair surprise at trial due to the form of the damage allegations of the answer. Nor should there have been any such unfair surprise. The Code of Civil Procedure provides ample discovery devices, including interrogatories and depositions of corporate parties, to determine an expropriation defendant's damage theories and evidence. See, e.g., La. Code Civ.Proc. arts. 1422, 1442, 1457-59.
Lastly, DOTD does not assert that it made any objection at trial to evidence or argument as to damages in excess of $1,050,000 or that it objected to the case being submitted to the jury with instructions and jury interrogatories that permitted the jury to award more than $1,050,000 in damages. "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised by the pleadings." La.Code Civ.Proc. art. 1154. In this case, damages in excess of $1,050,000 were tried by implied consent due to the lack of objection. Also, if an objection is not raised at trial it may not be raised for the first time on appeal. Rule 3-1 of Uniform Rules of Louisiana Courts of Appeal; Shepherd v. Allstate Ins. Co., 562 So.2d 1099, 1102 (La.App. 4th Cir.1990); Taylor v. First Jersey Securities, 533 So.2d 1383, 1388 (La.App. 4th Cir. 1988), writ denied, 538 So.2d 593, 594 (La.1989); Handy v. Cheatum, 410 So.2d 322 (La.App. 4th Cir.1982).
DOTD very briefly argues, with no citations to supporting authority, that the trial court erred by excluding from evidence the written reports of its appraiser expert witnesses. Those experts testified live at trial and DOTD's brief concedes that "it may be true that the direct testimony of the experts is the best evidence of their opinions." In fact, it is not error for the trial court to exclude written reports of experts who testify live at trial because their live testimony is the best evidence. See Griggs v. Dedhia, 499 *1366 So.2d 367 (La.App. 4th Cir.1986). Moreover, we cannot see how the exclusion could have prejudiced DOTD substantially as its experts testified in detail as to their appraisals.
DOTD argues that the trial court awarded excessive expert witness fees and excessive costs. The expert witness fees, for five Schwegmann expert witnesses, totalled $44,877. The other costs awarded, the bulk of which were for videos, photographs and other demonstrative evidence and courtroom visual aids, totalled $18,947.
DOTD does not challenge Schwegmann's right to recover expert witness fees and costs, but argues that they were not sufficiently proven and that the amounts awarded were excessive. The expert witness fees and other costs were proven by an affidavit which was admitted into evidence without objection. At that time, Schwegmann offered to present testimony as to the reasonableness of the expert witness fees and other costs. The trial court stated that such testimony was not necessary.
The trial court, having witnessed the entire trial, was in an excellent position to evaluate the complexity of the case and the need for extensive trial preparation as well as the actual presentation of evidence at trial. Indeed, the trial court remarked, in connection with the proof of the expert witness fees and other costs, that the case was very complex. That observation is well borne out by the lengthy record.
We do not believe the trial court abused its discretion in setting the amount of expert witness fees and other costs. The expert witness fees and other costs actually were incurred by Schwegmann. More importantly, the complexity of the issues in the case, the large amount at stake, and the need to present complex evidence in a way that would be most comprehensible to a jury, all increased the need for thorough pretrial preparation and careful trial presentation. The expert witnesses were all extremely well qualified and all were professional persons of great experience and accomplishment. The value of courtroom visual aids in a jury trial of this complexity is great. The trial court's award was not excessive.
For the foregoing reasons, the judgment of the trial court is affirmed.
AFFIRMED.
*1367 
LANDRIEU, Judge, concurs in part and dissents in part.
I concur that defendant is entitled to $150,000.00 in compensation for the land expropriated *1368 but dissent from the amount of the award for severance damages.
There are various entities in the Schwegmann family of businesses and there is little evidence in the record as to the owners of those entities or the contractual relationships between them. It is essential to bear in mind, however, that the only party to this litigation is Schwegmann Westside Expressway, Inc. and it is only the loss to that entity that can be compensated.
The taking of a 40 foot wide (13,272 sq. ft.) strip of property from the front of defendant's parking lot for the construction of a service road in conjunction with a mid-rise bridge built on plaintiff's existing right of way deprived defendant's property of direct access to and some visibility from Chef Menteur Highway. The defendant is clearly entitled to compensation to the full extent of its loss due to the expropriation and for the damage suffered by the remaining property as a result of the taking. However, the amount of damages awarded is not supported by the record and is clearly an abuse of discretion. The defendant is not entitled to imaginary damages nor to damages caused by those features of the new mid-rise bridge, not fronting its property, that might have made its property less valuable such as the sightlines from the bridge, the length of the approaches, or the entrance and exit ramps to and from France Road. Likewise, defendant is not entitled to loss of value because the new bridge advantaged defendant's competition or because of economic recession, changing buying habits, changing demographics, fear of crime, deterioration of the area, or competition introduced by the defendant or others.
At trial, five expert appraisers testified as to the severance loss to the defendant. Their estimates of damage suffered by defendant based on the difference in the value of the property as a whole immediately before and immediately after the taking were as follows:

 Guice (Defendant) $701,000
 Felts (Defendant) 767,792
 Talluto (Plaintiff) 167,251
 Eppling (Plaintiff) 121,089
 McCormick (Plaintiff) -0-

Counter to the estimates of its own appraisers as well as those of the plaintiff's, Mr. John Schwegmann, President of Schwegmann Westside Expressway, Inc., testified that before the bridge, the property was worth as much as $20,000,000 dollars and after the bridge, as little as $2,000,000. He offered no evidence to support those estimates except a graph showing that the gross sales of the supermarket, which reached $60,000,000 in 1984, had increased approximately $8,000,000 between 1980 and 1984 and had decreased approximately $25,000,000 between 1984 and 1990. He alleges that the bridge severely reduced access to and visibility of the property, thereby causing the loss of gross sales. No evidence was introduced proving loss of rent to the defendant nor loss of profit to the entity which owns the market. Nor was any evidence introduced with respect to an adverse effect on revenue received from subtenants or on the 35,000 square feet of defendant's corporate offices located in the building.
Defendant then introduced three experts on real estate development who testified that the bridge had changed the highest and best use of the property from that of a Schwegmann Giant Supermarket to a flea market or warehouse and two of them testified further that in their opinion the bridge caused the property to lose more than half its value. None of the development experts performed an appraisal either before or after the taking and none gave an opinion as to the value of the property before or after the taking.
Based on these broad opinions, the jury awarded the defendant $5,000,000 ($150,000 for the property expropriated and $4,850,000 in severance damages). Even if we were to assume that every dollar of lost gross sales experienced by defendant's tenant was caused solely by the taking of defendant's property, which clearly is not the case, the question remains: "What does the loss of sales mean to defendant or defendant's property?"
Methods which use tenant sales data six years after the taking are inappropriate to measure defendant's loss at the time of the taking, but they serve as a broad check against the damages awarded. When defendant built the supermarket on this property in the mid 1950's, it was the largest of its *1369 kind in the world and sold a multitude of items ordinarily not sold in food markets. However, the supermarket now faces competition from Marshall's, Steinmart, K-Mart, Sam's, The Real Super Store, and other national chains, as well as from a new Schwegmann Giant Supermarket which can be reached in five minutes from this site by way of I-10. From 1984 to 1990, gross sales decreased approximately as follows:

 1984 $2,000,000
 1985 2,000,000
 1986 3,000,000
 1987 6,000,000
 1988 6,000,000
 1989 6,000,000

The cumulative total amounts to $70,000,000 in loss sales. Although, defendant introduced no evidence of the amount of rent it received from the operation of the market, a large food retailer could afford to pay one percent of gross sales in rent. That would represent a direct loss of $700,000 in rent to defendant over a six year period. If rent were one and one half percent, the loss to defendant would have been $1,050,000. Defendant, however, makes no claim for loss of rent but rather for loss of value of the remaining real estate, using the sales figure to support its contention.
Approaching the problem from that perspective and taking the highest one year loss, which took place six years after the taking, and treating it as permanent thereafter, we can estimate defendant's loss of value as follows: $25,000,000 in lost gross sales means $250,000 in lost rent at one percent of gross sales. Assuming that a twelve percent return is a fair return on this type of an investment, defendant's loss of rental income, capitalized at twelve percent, amounts to a capital loss of $2,083,333.
The majority, however, holds that the jury verdict of $5,000,000 is justified because the difference between the highest "before taking appraisal" by one of plaintiff's experts and the lowest "after taking appraisal" by one of defendant's experts is $6,219,000. The problem with this reasoning is that the plaintiff's appraiser valued the property, before and after, as it was being used by Schwegmann Giant Supermarket while defendant's appraiser valued the property as if it were not. The jury could accept either method but it is clearly illogical for it to mix plaintiff's appraisers' value (used as a giant market) and defendant's appraisers' value (not used as a giant market) and conclude that the difference was the range of damages.
The folly of this approach is demonstrated by the result. Defendant's own expert witnesses testified that before the taking, defendant's property was worth $3,060,000 and $4,050,000, respectively. The jury awarded defendant $5,000,000 even though defendant gets to retain 535,378 sq. ft. of land with a 255,000 sq. ft. building, 35,000 sq. ft. of corporate offices and a tenant producing $35,000,000 in annual sales.
Damages in expropriation suits are special in nature and must be proven with particularity. For that reason, expert testimony is not only permitted but necessary to assist the jury in judging the amount of compensation to which the defendant is entitled. While a jury is not bound to accept the testimony in its entirety of any one expert, it does not have the broad latitude of ignoring the experts' testimony on values nor of picking irrationally from different appraisal methods and mixing them to arrive at an illogical result.
There is little doubt that plaintiff's property has been damaged by restricting its visibility and altering its direct access from Chef Menteur Highway. The only question to be answered is "How much?". Defendant's own expert appraisers assess the damage at $701,000 and $776,792, respectively. Plaintiff's two highest appraisers assess the damage at $167,251 and $121,089. The difference can be accounted for by the assumptions usedoccupied or unoccupied by a Schwegmann Giant Supermarket. Both methods would appear to be acceptable. Because there is no evidence of a lease between defendant and Schwegmann Giant Supermarket and a willing buyer could not rely on the continued presence of Schwegmann Giant Supermarket, appraising the real estate before and after the taking without its presence appears more reasonable. Therefore, I would average the damages estimated by defendant's appraisers and award defendant $738,896 in severance damages.